**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

JASHUA WILLIAMS,

                            Petitioner,                9:21-CV-00993
    v.                                                         (AMN/PJE)

TIMOTHY MCCARTHY,

                            Respondent.

_____

**APPEARANCES:**                                       **OF COUNSEL:**

JASHUA WILLIAMS
Petitioner, pro se
16-B-3058
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

HON. LETITIA JAMES                      PRISCILLA I. STEWARD, ESQ.
Attorney for Respondents              Assistant Attorney General
Attorney General of New York
28 Liberty Street
New York, New York 10005

**PAUL J. EVANGELISTA
U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION and ORDER**

I.    **INTRODUCTION**

Petitioner pro se Jashua Williams seeks federal habeas relief pursuant to 28 U.S.C. § 2254. Dkt. No. 1, Petition ("Pet."). Respondent opposed the petition. Dkt. No. 13, Answer; Dkt. No. 13-1, Response Memorandum (Resp."); Dkt. No. 14, State Court Record ("Record"); Dkt. No. 14-1, Trial Transcript. Petitioner did not reply. For the

reasons below, it is recommended that the petition be denied and dismissed in its entirety.

## II.    RELEVANT BACKGROUND

### A.  Shooting of A'Nickalus Hill

In July 2015, petitioner resided with his girlfriend, Ashley Vought, in Vought's Syracuse, New York apartment.  Record at 630.  The pair shared the apartment with Vought's three-year-old son and her grandmother.  *Id.*  Sometime in June 2015, A'Nickalus Hill, the second cousin of Vought's son, began renting a spare room from Vought as Hill searched for a permanent residence.  *Id.*  Hill's three children occasionally slept over.  *Id.*  Ryan Ernestine, a friend of Vought's, also sporadically stayed on the apartment's couch.[1]  *Id.*

In July 2015, Hill spoke to Vought's grandmother about petitioner's habit of repeating the internet joke, "deez nuts," around Vought's son.  Record at 631.  Hill disapproved of petitioner's use of inappropriate language around the young child and expressed his frustrations to Vought's grandmother.  *Id.*; Dkt. No. 14-1 at 116-17.  After her conversation with Hill, Vought's grandmother relayed Hill's complaints to petitioner. Dkt. No. 14-1 at 117.

On the night of July 28, 2015, petitioner, Vought, Ernestine, and another man, Harry Shelton, were driving around in Vought's car.  Record at 631.  As Ernestine drove,

---

[1]  Throughout the summer of 2015, Ernestine was absconding from law enforcement.  Record at 630-31. Ernestine had recently pled guilty to a first-degree armed robbery charge and agreed to cooperate with the Onondaga Sheriff's Department on an unrelated issue.  *Id.*  After pleading guilty and agreeing to cooperate, Ernestine was released pending his sentencing hearing.  *Id.*  Once released, Ernestine skipped his sentencing hearing and went into hiding, often staying at Vought's house.  *Id.* at 631.

2

petitioner, Vought, and Shelton drank alcohol.  *Id.*  Petitioner also took cocaine; Ernestine used heroin.  *Id.* at 631-32.

While in the car, petitioner began to express his anger about Hill's "deez nuts" complaints.  Record at 632.  The more petitioner spoke about Hill, the more upset he became.  Dkt. No. 14-1 at 118-19; 189.  After venting his frustrations about Hill, petitioner allegedly asked Shelton for a "tooly[,]" or gun, and claimed he planned on "put[ting] a bullet in [Hill]."  *Id.* at 190-91.[2]  Shelton attempted to dissuade petitioner from shooting Hill, and instead encouraged petitioner to fight Hill.  Record at 632.  After Shelton twice turned down petitioner's request for a gun, petitioner dropped the topic.  *Id.*

Ernestine testified that about twenty minutes after petitioner's request for a gun, Shelton directed Ernestine to stop by Shelton's house.  Record at 633.  As requested, the party stopped at the house and watched as Shelton went in alone and came out shortly after with nothing in his hands.  *Id.*; Dkt. No. 14-1 at 192-93.  Ernestine testified that he assumed Shelton retrieved his gun.  Dkt. No. 14-1 at 243-44.  With dawn breaking, the group returned to Vought's house.  *Id.* at 123, 192-93.

Upon arriving at Vought's house, Vought told petitioner to not start any trouble with Hill while her family was in the house.  Dkt. No. 14-1 at 123.  Petitioner responded that he did not care about her family, nor did he care that Hill's children were there.  *Id.*  Petitioner then went to Hill's bedroom, woke him, and asked to speak with him in the dining room.  *Id.* at 124-25, 194-95; Record at 633.  The two men walked to the dining

---

[2]  In her testimony, Vought denied hearing anything about a "tooly" or gun violence in general while in the car.  Record at 632.  Vought did testify that, with Shelton's encouragement, petitioner repeatedly said he would confront and fight Hill.  *Id.* at 632-33.

room where Vought and Shelton waited. Dkt. No. 14-1 at 125-27; Record at 633. Shelton instructed Vought to leave the room; she complied. Dkt. No. 14-1 at 127. While walking out of the room, Vought testified that she heard petitioner begin to question Hill about the "deez nuts" issue. *Id.* Hill denied the accusations, but the conversation soon devolved into a physical encounter. *Id.* at 127-28, 195-96; Record at 634. Vought, Ernestine, and Hill's son all heard Hill begin to plead, stating, "my kids are here" and "no, no, no." Dkt. No. 14-1 at 52, 128, 235. Hill's son also heard petitioner say, "we got to do this now." *Id.* at 53. A gunshot was then heard. *Id.* at 52-53, 196.[3]

After being shot, Hill escaped to his bedroom where he jumped out of his window and fled before collapsing on a nearby street where a pedestrian found him and brought him to a hospital where Hill succumbed to his wounds. *Id.* at 53, 78-79; Record at 634.

Back at the house, petitioner attempted to follow Hill, Shelton left to hide the gun, and Vought began to clean the scene. Record at 634-35. Petitioner soon returned and with Vought, Vought's grandmother, and son, and Ernestine fled the scene in Vought's vehicle. The car picked up Shelton around the corner and then continued its escape. Record at 635. Hill's three children remained alone in the house until officers arrived. *Id.*

### B. Investigation and Arrest

Vought returned home later that day and agreed to speak with the police. Record at 716; Dkt. No. 14-1 at 142-43. Vought was not entirely forthcoming during the first interview but spoke with the police again a few weeks later and, this time, provided her

---

[3] Petitioner argues in his state papers that while fighting with Hill, he saw Shelton with a gun in his hand. Record at 634. Petitioner testified that he told Shelton to put the gun away but that Shelton ignored him and shot Hill. *Id.* Neither Vought, Ernestine, nor Hill's son heard petitioner question Shelton about the gun.

full recollection of the night in question.  Record at 717; Dkt. No. 14-1 at 144.  Based on her interviews, police charged Vought with one count of Hindering Prosecution in the First Degree.  Record at 717; Dkt. No. 14-1 at 144.  Vought eventually pled guilty to Hindering Prosecution in the Third Degree in exchange for her testimony against petitioner.  Record at 717; Dkt. No. 14-1 at 144-45.

The police apprehended Ernestine in November 2015.  Record at 636-37.  Upon his arrest, the prosecutors assigned to his unrelated armed robbery charge sought a rescheduled sentencing hearing with a recommended prison sentence of fifteen years.  *Id.* at 637.  Homicide detectives investigating Hill's murder interrogated Ernestine soon after his arrest and advised him to cooperate on the Hill murder in exchange for the chance of leniency on the armed robbery charge.  Record at 637-38.  Police made no promises as to the exact sentence Ernestine would receive on the armed robbery charge.  *Id.* at 638; Dkt. No. 14-1 at 209.

Shelton and petitioner also both spoke with investigators in November 2015.  Record at 636.  Shelton denied being in the house that night; petitioner blamed the shooting on Shelton.  *Id.* at 636-37.

On December 2, 2015, an Onondaga County Grand Jury charged both petitioner and Shelton with one count of Murder in the Second Degree, two counts of Criminal Possession of a Weapon in the Second Degree, and one count of Endangering the Welfare of a Child.  Record at 707.  Petitioner and Shelton were tried separately.[4]  *Id.*

---

[4] At his trial, Shelton testified that petitioner shot Hill.  Record at 638-39.  The jury acquitted Shelton on the murder and criminal possession of a weapon charges but convicted Shelton of endangering the welfare of a child.

### C. Trial

Petitioner elected for a bench trial. Record at 707. Ernestine, Vought, and Hill's son all testified against petitioner. *See* Dkt. No. 14-1 at 45, 102, 179. Petitioner did not testify or call any witnesses. *See generally* Dkt. No. 14-1. At the close of evidence, petitioner moved to dismiss the case, arguing that Ernestine's testimony was non-credible as a matter of law, and, therefore, no sufficient evidence existed to convict petitioner. *Id.* at 357-363. The trial court denied the motion. *Id.* at 363-64. The trial court then convicted petitioner on all counts.[5] *Id.* at 442-43.

Prior to his sentencing, petitioner filed a C.P.L. § 330.30 motion to set aside the judgement, again arguing that Ernestine's testimony was not credible. Dkt. No. 14-1 at 446-49. The trial court denied the motion at petitioner's sentencing, stating that, as the trier of fact, he found Ernestine's testimony credible considering the totality of the circumstances. *Id.* at 450-53.

The trial court then imposed the maximum sentence for each count, all to run concurrently, producing an aggregate sentence of twenty-five years to life. Dkt. No. 14-1 at 474-75.

### D. Direct Appeal

Petitioner timely appealed his conviction to the New York State Appellate Division, Fourth Department ("Fourth Department"). Record at 620-698. Petitioner argued that: (1) the verdict was based on legally-insufficient evidence as the prosecution failed to prove petitioner aided and abetted Shelton; (2) the verdict was

---

[5] The trial court convicted petitioner of second-degree murder on the theory that Shelton shot Hill, but petitioner aided and abetted Shelton and was, therefore, guilty of second-degree murder pursuant to N.Y. Penal Law §§ 125.25(1) and 20.00. Record at 731; Dkt. No. 14-1 at 367.

6

against the weight of the evidence as Ernestine's testimony was contradictory and incredible; (3) trial counsel performed ineffectively for failing to present evidence of the promise of leniency police allegedly made to Ernestine; and (4) petitioner's sentence was harsh and severe. *Id.* at 623-25.

On January 31, 2020, the Fourth Department denied petitioner's appeal. Record at 793-94. The Fourth Department first found that, based on the evidence presented, the trial court "reasonably concluded that [petitioner] and [Shelton] . . . shared a common purpose and a collective objective" when the pair attacked Hill, and such a finding was "legally []sufficient to establish [petitioner's] liability as an accessory[.]" *Id.* at 793 (internal quotation marks and citations omitted).

The appellate court next ruled that the verdict was adequately supported by the weight of the evidence. Record at 793-94. The Fourth Department held that Ernestine's "trial testimony . . . was not incredible as a matter of law . . ., and any inconsistencies in [Ernestine's] testimony merely presented issues of credibility for the factfinder to resolve[.]" *Id.* at 794 (internal citations omitted). Thus, the Fourth Department concluded that the trial court "did not fail to give the evidence the weight it should be accorded[.]" *Id.*

The Fourth Department then rejected petitioner's ineffective assistance of counsel claim, stating that the "record on appeal contains no evidence of any agreement [between Ernestine and the prosecution] beyond [Ernestine's] general hope for leniency[.]" Record at 794. Thus, without an actual promise, the appellate court found no fault with trial counsel's strategic decision to focus on other issues and dismissed the

7

claim accordingly.  *Id.*  The Fourth Department also summarily rejected petitioner's claim that his sentence was harsh and severe.  Record at 794.

Petitioner sought leave to appeal to the New York Court of Appeals.  Record at 795-805.  The Court of Appeals denied leave on May 28, 2020.  Record at 809.  Petitioner filed the instant petition on September 8, 2021.

### III.  PETITION

Petitioner challenges his 2016 judgment of conviction in New York State County Court, County of Onondaga.  Pet. at 1-15.  Petitioner argues he is entitled to federal habeas corpus relief because: (1) insufficient evidence existed to support his conviction of second-degree murder, Pet. at 5-6; (2) all of his convictions were against the weight of the evidence, *id.* at 6-8; (3) of ineffective assistance of trial counsel, *id.* at 8-9; and (4) his sentence was harsh and severe, *id.* at 9-11.  Petitioner seeks a new trial or release from custody.  *Id.* at 14.

### IV.  ARGUMENT

#### A.  Standard of Review

Prior to reviewing petitioner's claims, the Court notes the heightened standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA requires a federal court sitting in habeas review to defer to a state court's adjudication of claims made on the merits unless the "decision [] was contrary to, or involved an unreasonable application of, clearly established federal law[] . . . or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Thus, a federal court may not grant relief "simply because that court concludes in its independent judgment that the

relevant state-court decision applied . . . federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, a federal court may only grant relief if it finds the state court's application of federal law or fact "objectively unreasonable." *Id.* at 409.

Thus, to find for petitioner on claims that the Fourth Department found meritless, this Court must hold the state appellate court's application of fact or federal law objectively unreasonable. *Williams*, 529 U.S. at 409.

### B. Claim 1: Insufficient Evidence

Federal habeas courts must find evidence legally sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Coleman v. Johnson*, 566 U.S. 650, 654-55 (2012) (finding evidence sufficient where "jurors draw reasonable inferences from basic facts to ultimate facts.") (cleaned up). A petitioner challenging the sufficiency of the evidence "bears a very heavy burden." *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 (2d Cir. 1997). On top of the typical "heavy burden" described above, this Court also owes the Fourth Department's rejection of petitioner's identical state court claim AEDPA deference. *Williams*, 529 U.S. at 409; *Coleman*, 566 U.S. at 656. Thus, this Court may only rule for petitioner on Claim 1 if the undersigned finds the Fourth Department's decision "objectively unreasonable." *Williams*, 529 U.S. at 409; *Coleman*, 566 U.S. at 656.

When a federal habeas court examines an insufficient evidence claim from state court, the federal court "must look to state law for the substantive elements of the

criminal offense[.]" *Coleman*, 566 U.S. at 655. A person is guilty of second-degree murder in New York when: "[w]ith intent to cause the death of another person, he causes the death of such person[.]" N.Y. Penal Law § 125.25(1). A person may be convicted of second-degree murder as an accomplice if the prosecution can show the person "act[ed] with the mental culpability required for the commission [of the murder], [and that the person] solicits, requests, commands, . . . or intentionally aids [another]" in the murder. N.Y. Penal Law § 20.00.

 Petitioner claims that the trial court convicted him of second-degree murder without sufficient evidence to prove that he intended to kill Hill or that he intentionally aided Shelton in Hill's death. Pet. at 5-6.

 The Fourth Department ruled against petitioner on an identical claim in state court. Record at 793. The appellate court stated that a reasonable factfinder could have found petitioner "shared a common purpose and a collective objective" with Shelton, and, therefore, the murder conviction was supported by sufficient evidence. *Id.* (internal quotation marks omitted). After an inspection of the record, this Court concludes the Fourth Department's decision that petitioner intended to kill Hill and aided Shelton in killing Hill was not "objectively unreasonable." *Williams*, 529 U.S. at 409.

 Taken in the light most favorable to the prosecution, the trial testimony established that petitioner intended to kill Hill. Ernestine and Vought both testified that petitioner grew increasingly upset at Hill in the hours before Hill's death. Dkt. No. 14-1 at 117-19; 189-91. The pair also testified that petitioner said he would confront Hill physically. *Id.* at 121; 191. Ernestine testified that petitioner asked Shelton for a gun because he planned on "put[ting] a bullet in" Hill. *Id.* at 191. Petitioner then proceeded

to follow through on his threats, confronting and fighting Hill at the first chance he had. *Id.* at 51-53, 194-96; Record at 714-15.  In addition, Hill's son testified that during the fight between Hill and petitioner, he heard petitioner say "[w]e got to do this now" followed by a gunshot.  *Id.* at 53.  Considering these facts, the undersigned finds that a rational trier of fact could reasonably infer that petitioner intended to kill Hill.

The prosecution also produced sufficient evidence to prove petitioner intentionally aided Shelton in killing Hill.  Ernestine and Vought testified that, after arriving home in the early hours of July 29, it was petitioner who went and woke Hill, walked Hill to the dining room, and confronted Hill about the "deez nuts" statement.  Dkt. No. 14-1 at 124-25, 194-95.  Petitioner himself admitted in an interview to the police that it was petitioner, not Shelton, who initiated the fight with Hill.  Record at 634; Dkt. No. 14-1 at 296, 299.  Ernestine, Vought, and Hill's son all stated that Hill begged for his life, and Hill's son testified that instead of stopping Shelton from shooting Hill, petitioner instead proclaimed "we got to do this now" immediately prior to the shooting.  Dkt. No. 14-1 at 53.  Viewing the evidence in the light most favorable to the prosecution, it appears that petitioner brought Hill to a room where he planned to confront Hill with Shelton and then encouraged Shelton to shoot Hill.  Based on such facts, a rational trier of fact could reasonably infer that petitioner intentionally aided Shelton in killing Hill.

"[T]he only question under *Jackson* is whether [the guilty verdict] was so insupportable as to fall below the threshold of bare rationality."  *Coleman*, 566 U.S. at 656.  The state court of last review did not think as much, and the undersigned does not believe that decision objectively unreasonable.  Therefore, the undersigned determines

that the evidence sufficiently supported petitioner's second-degree murder conviction. Accordingly, it is recommended that the Court dismiss Claim 1.

### C. Claim 2: Weight of the Evidence

Under 28 U.S.C. § 2254(a), this Court may only "entertain an application for a writ of habeas corpus . . . on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a); *see also Thomas v. Larkin,* No. 1:12-CV-2899, 2013 WL 5963133, at *13 (E.D.N.Y. Nov. 7, 2013) ("[F]ederal courts may not issue the writ of habeas corpus on the basis of a perceived error of state law[.]") (cleaned up).

Petitioner claims his convictions were against the weight of the evidence. Pet. at 6-8. However, an "argument that a [state court] verdict is against the weight of the evidence [is] a claim under state law[]" and is "not cognizable on [federal] habeas corpus [review.]" *McKinnon v. Superintendent, Great Meadow Correctional Facility*, 422 F. App'x 69, 75 (2d Cir. 2011); *Gonzales v. Graham*, 9:17-CV-1321 (JKS), 2020 WL 7397529, at *8 (N.D.N.Y. Dec. 17, 2020) ("Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is an error of state law, for which habeas review is not available.") (internal quotation marks omitted).

As petitioner's Claim 2 asks no federal question, the undersigned recommends that the Court dismiss the claim as non-cognizable.

### D. Claim 3: Ineffective Assistance of Counsel

To succeed on a claim of ineffective assistance of counsel, a petitioner must show that: "(1) counsel's performance was objectively deficient, and (2) petitioner was

actually prejudiced as a result." *Harrington v. U.S.*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

To satisfy the first *Strickland* prong, a petitioner must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Such errors include omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (cleaned up); *Pena v. United States*, 192 F. Supp. 3d 483, 490 (S.D.N.Y. 2016) (A "strategic decision [by counsel], whether wise in retrospect or not, is among those professional judgment calls that are unchallengeable under *Strickland*.") (internal quotation marks omitted). When reviewing an ineffective assistance claim, courts must be "highly deferential" and approach the analysis with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689.

The second *Strickland* prong requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Courts must look to the "cumulative weight of error" to determine whether any potential prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001). Petitioner must meet both "the performance prong [and] the prejudice prong[]" to demonstrate a Sixth Amendment violation. *Bennett v. U.S.*, 663 F.3d 71, 85 (2d Cir. 2011).

To satisfy *Strickland*'s first prong, petitioner alleges that his lawyer failed to prove that police made a promise of leniency to Ernestine in exchange for Ernestine's testimony against petitioner.[6]  Pet. at 8-9.  Trial counsel made several attempts to establish that a promise existed between police and Ernestine, starting with his opening statement where trial counsel stated that "our position at this trial is that [] Ernestine, although it's not in writing and [Ernestine] may deny [it] on the stand, is that [Ernestine has been promised to] get[] fifteen years in state prison reduced down to . . . time served." *Dkt. No. 14-1 at 39.*  Trial counsel pointed to statements Syracuse Police Detective Jeremy Merola made to Ernestine during Ernestine's initial interview as evidence of a promise of leniency.  Specifically, trial counsel noted that Detective Merola told Ernestine he had a "golden ticket" and that Ernestine may be shown "a lot of leniency" if he testified against petitioner.  *Id.* at 37-39.  Trial counsel also attempted to elicit testimony that Ernestine received a promise of leniency during Ernestine's cross-examination.  *Id.* at 226-27.  Ernestine rebuffed trial counsel's attempts, saying he did not remember his initial conversation with police as he was coming down from "a heroin bender" at the time.  *Id.* at 227.

Despite such attempts to establish a promise between police and Ernestine, petitioner maintains that trial counsel should have questioned Detective Merola about the issue and introduced the video recording of Ernestine's initial interview.  Record at 693.  Petitioner infers that trial counsel not doing so resulted from mere laziness, and if trial counsel had questioned Detective Merola about the alleged promise or introduced

---

[6] As discussed in Section II.A above, at the time of Hill's death, Ernestine was a fugitive after skipping his sentencing hearing on an unrelated burglary charge.   After police caught Ernestine in November 2015, Ernestine faced fifteen years in state prison on the burglary charge.  Thus, Ernestine's motive to seek leniency.

14

the interview video, trial counsel would have established that Ernestine received a promise of leniency. *Id.* at 694.

The Fourth Department rejected petitioner's identical claim in petitioner's direct appeal. Record at 794. The appellate court noted that significant evidence existed that no promise was made and "[t]he record on appeal contains no evidence of any [promise.]" *Id.* Thus, "[trial] counsel's failure to [attempt to] adduce additional proof of a specific agreement" was a strategic decision the Fourth Department would not second guess. *Id.* (internal quotation marks omitted). As the Fourth Department ruled on the merits of the issue, this Court cannot find for petitioner on his ineffectiveness claim unless the undersigned believes the appellate court's decision was objectively unreasonable. *Williams*, 529 U.S. at 409. The undersigned declines to do so.

The record before this Court reflects that Detective Merola made no promise to Ernestine, and, in fact, Detective Merola explicitly said "the homicide ADA [will] make the [final] call[]" on whether Ernestine would receive leniency. Dkt. No. 14-1 at 38. As such, the undersigned concludes that both the potential testimony by Detective Merola or the introduction of the interview video could not have established that an actual promise was made to Ernestine because, in fact, no promise was made. Further, introducing either piece of evidence would have explicitly disproved petitioner's contention that police made a promise of leniency to Ernestine. Thus, this undersigned finds trial counsel's refusal to pursue Detective Merola's testimony on the issue or to introduce the interview video sound "strategic decision[s]" made to protect his contention that police made a promise to Ernestine. *See Pena*, 192 F. Supp. 3d at 490.

The undersigned will not second guess a trial counsel's strategic choices, and, accordingly, determines that petitioner failed to satisfy *Strickland*'s first prong.

Even if, *arguendo*, petitioner could establish *Strickland*'s first prong, the undersigned finds no evidence that trial counsel's decision harmed petitioner. Petitioner argues that trial counsel's failure to establish an actual promise between police and Ernestine prejudiced him as it prevented petitioner from proving Ernestine had "a strong motive to lie[.]" Record at 694. The Court disagrees. Both trial counsel and the prosecution touched on Ernestine's hope for leniency and his motive to cooperate with the prosecution. *See* Dkt. No. 14-1 at 38-39, 245. Further, the trial court explicitly stated that, when weighing the evidence, it credited Ernestine's testimony despite Ernestine's motive to lie. Dkt. No. 14-1 at 451-52. Thus, even if petitioner could have demonstrated that police promised Ernestine leniency, such evidence would have been redundant as the trial court already recognized that Ernestine possessed a motive to testify against petitioner. Thus, "the result of the proceeding would [not] have been different[,]" *Strickland*, 466 U.S. at 694, even if trial counsel succeeded in demonstrating a promise of leniency existed. With no evidence of prejudice, the undersigned finds petitioner failed to satisfy *Strickland*'s second prong. Accordingly, it is recommended that Claim 3 be dismissed.

### E. Claim 4: Harsh and Severe Sentence

Petitioner's last claim argues that the trial court's sentence was unduly harsh. Pet. at 9-10. Petitioner's claim is not cognizable on habeas review.

As discussed in Section IV.C. above, a federal court sitting in habeas review may only "entertain an application for a writ of habeas corpus . . . on the ground that [a

petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a); *see also Thomas v. Larkin,* No. 1:12-CV-2899, 2013 WL 5963133, at *13 (E.D.N.Y. Nov. 7, 2013) ("[F]ederal courts may not issue the writ of habeas corpus on the basis of a perceived error of state law[.]") (cleaned up). For excessive sentence habeas claims, the Second Circuit has held that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

Here, petitioner received the maximum sentence allowed under New York law for each count of the indictment, producing an aggregate prison term of twenty-five years to life. Dkt. No. 14-1 at 474-75. As petitioner received sentences within the statutory range allowed by law, petitioner's request for federal habeas review is non-cognizable as no federal issue has been presented. Thus, it is recommended that petitioner's Claim 4 be dismissed.

## V.   CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Petition, Dkt. No. 1, be **DENIED AND DISMISSED** in its entirety; and it is further

**RECOMMENDED**, that the Court decline to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). Any further request for a

Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(d); 2d Cir. R. 22.1; and it is

**ORDERED**, that the Clerk provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED**, that the Clerk serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**IT IS SO ORDERED.**

Dated: March 11, 2025
Albany, New York

*/s/ Paul J. Evangelista*
Paul J. Evangelista
U.S. Magistrate Judge